UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**Case No. 21-cv-60555-BLOOM**

ORLAND McCORMACK,

      Petitioner,

v.

FLORIDA DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

**ORDER ON MOTION FOR RECONSIDERATION**

**THIS CAUSE** is before the Court upon Petitioner Orland McCormack's Motion to Reconsider, Alter, or Amend Judgment, ECF No. [20] (the "Motion"), filed on June 6, 2022. Therein, McCormack seeks reconsideration of the Court's Order of Dismissal, ECF No. [19], denying his petition as untimely. The State did not file a response. For the reasons set forth below, the Motion is granted, but McCormack's Petition is denied.

**I.      BACKGROUND**

On October 8, 2020, McCormack filed a Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254 by a Person in State Custody, ECF No. [13] (the "Petition"). *See* ECF No. [19] at 1 n.1 (explaining that McCormack provided his Petition to prison authorities for mailing on October 8, 2020); *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009) ("Under the 'prison mailbox' rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing.").

Following briefing, the Court dismissed the Petition as time barred by the one-year statute of limitations applicable to § 2254 petitions, as set forth in the Antiterrorism and Effective Death

Penalty Act ("AEDPA"). ECF No. [19] at 3. The Court reasoned that the one-year period commenced on September 15, 2017, thirty days after the Fourth District Court of Appeal ("Fourth DCA") affirmed McCormack's convictions, since that is the period in which he could have sought discretionary review by the Florida Supreme Court. *Id.* at 4-5. Because McCormack "did not seek review from Florida's highest court," the Court concluded "he is not entitled to the 90-day period for seeking certiorari review with the United States Supreme Court." *Id.* at 5 n.5 (citing *Phillips v. Warden*, 908 F.3d 667, 673 (11th Cir. 2018)). Applying September 15, 2017 as the trigger date for the one-year limitations period, the Court concluded that the Petition was untimely. *Id.* at 6.

In the instant Motion, McCormack argues that this Court erred in determining the date McCormack's conviction became final. ECF No. [20]. He argues that the Fourth DCA's affirmance, albeit a "written opinion," was not an elaborated opinion addressing any point of law that would be subject to discretionary review by the Florida Supreme Court. *Id*. at 3. He therefore argues that the Fourth DCA constituted his court of last resort in Florida, so he was entitled to the 90-day period after the Fourth DCA's decision to seek certiorari to the U.S. Supreme Court. *Id.* at 5 (citing Supr. Ct. R. 13(1)). With the benefit of those additional 90 days, McCormack asserts that his Petition was timely filed. *Id*. at 7.

## II.    LEGAL STANDARD

A motion for reconsideration is "an extraordinary remedy to be employed sparingly." *Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1370 (S.D. Fla. 2002). "The burden is upon the movant to establish the extraordinary circumstances supporting reconsideration." *Saint Croix Club of Naples, Inc. v. QBE Ins. Corp.*, No. 2:07-cv-00468-JLQ, 2009 WL 10670066, at *1 (M.D. Fla. June 15, 2009).

A motion for reconsideration must clearly "set forth facts or law of a strongly convincing nature to demonstrate to the Court the reason to reverse its prior decision." *Am. Ass'n of People*

*with Disabilities v. Hood*, 278 F. Supp. 2d 1337, 1339 (M.D. Fla. 2003). As such, a court will not reconsider its prior ruling without a showing of "clear and obvious error where the 'interests of justice' demand correction." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, No. 6:11-cv-1637, 2013 WL 425827, at *1 (M.D. Fla. Feb. 4, 2013) (quoting *Am. Home Assurance Co. v. Glenn Estess & Assoc.*, 763 F.2d 1237, 1239 (11th Cir. 1985)).

### III.   DISCUSSION

#### A.  Rule 60(b) Reconsideration

McCormack has demonstrated that the Court applied an incorrect legal standard when it determined that the Fourth DCA's affirmance was appealable to the Supreme Court of Florida. In its Order of Dismissal, the Court stated: "Because the Fourth DCA affirmed Petitioner's convictions in a written opinion, the Florida Supreme Court had jurisdiction to review the opinion." ECF No. [19] at 5 n.5. McCormack is correct that the Supreme Court of Florida's jurisdiction does not turn on whether the Fourth DCA's decision was "written." ECF No. [20] at 2-6. Rather, the appealability of a DCA decision turns on whether it "contain[s] any discussion of the facts in the case such that it could be said that the district court expressly addresse[d] a question of law within the four corners of the opinion itself." *Gandy v. State*, 846 So. 2d 1141, 1144 (Fla. 2003) (quotation marks omitted). The Supreme Court of Florida lacks jurisdiction to consider a decision from a DCA that "does not contain any statement or citation establishing a point of law upon which the decision rests." *Wheeler v. State*, 296 So. 3d 895, 897 (Fla. 2020).

Upon closer examination of the Fourth DCA's affirmance of McCormack's convictions, it is less clear that the affirmance was appealable to the Supreme Court of Florida. *See McCormack v. State*, 226 So. 3d 871 (Fla. 4th DCA 2017). The affirmance states in full:

May, J.

We grant the State's motion for rehearing. In its motion, the State advised

3

the court that the record submitted on appeal failed to include the order denying the defendant's motion under Florida Rule of Criminal Procedure 3.800(b)(2), which addressed *Williams v. State*, 186 So.3d 989 (Fla. 2016). In fact, the record included an affidavit attesting "there had been no order addressing the 4–12–16 Motion to Correct Sentencing Error." This was the sole basis for our reversal.

The State has now filed the order and the transcript from the hearing on the Rule 3.800(b)(2) motion. We supplement the record with both, withdraw our prior opinion, and affirm on all issues raised in the appeal.

*Affirmed*.

Taylor and Ciklin, J.J., concur.

*Id*. The Fourth DCA's decision granted rehearing and withdrew its prior opinion, which had remanded for resentencing in light of the *Williams* case. *See* ECF No. [16-1] at 90-93. The State had agreed to resentencing because it believed the trial court was unaware of *Williams* when it sentenced McCormack. *See id.* at 90. However, subsequent to the Fourth DCA's remand, the State discovered that the trial court had already resentenced McCormack in light of *Williams*. *Id.* at 96 (explaining that a "clerical error" led to the State's error). The State supplemented the record and successfully moved for reconsideration, leading to the decision copied in full above. *Id.*

McCormack asserts that the Fourth DCA's affirmance after rehearing does not discuss the facts of McCormack's case, nor does it address a question of law. ECF No. [20] at 4. He argues that it does nothing more than withdraw the prior, erroneous decision, and "affirm on all issues raised in the appeal." *Id.* The Government declined to respond to McCormack's Motion, and the Government did not address this specific issue in its original Response. *See* ECF No. [15] at 5 (arguing incorrectly that the affirmance was appealable because it was a "written opinion").

The Court has found no authority directly addressing whether an affirmance like McCormack's is appealable to the Florida Supreme Court. Although McCormack is correct that the Fourth DCA's affirmance contains no discussion of the facts of McCormack's trial, it does contain a limited discussion of the procedural issue regarding McCormack's entitlement to a

resentencing. *McCormack*, 226 So. 3d at 871. The Court therefore finds it likely that the Supreme Court of Florida had jurisdiction to consider an appeal of the Fourth DCA's affirmance.

Accordingly, as this Court previously decided, ECF No. [19] at 5 n.5, McCormack was not entitled to the 90-day period to seek certiorari to the U.S. Supreme Court. *See Phillips*, 908 F.3d at 673. His conviction therefore became final thirty days after the Fourth DCA's affirmance was issued, on September 15, 2017. Because that is more than one year before McCormack filed his Motion for Postconviction Relief on November 1, 2018, ECF No. [16-1] at 104, his one-year period under AEDPA expired long before his federal Petition was filed. The Court correctly deemed McCormack's Petition untimely.

However, due to the uncertainty regarding the appealability of the Fourth DCA's affirmance, and the State's failure to contest McCormack's position, the Court will entertain the possibility that the Fourth DCA's affirmance was not appealable, such that it constitutes the "state court last resort" in this case, *Gonzalez v. Thaler*, 565 U.S. 134, 154 (2012) (quoting Supr. Ct. R. 13.1). In that regard, McCormack *would* be entitled to the 90-day period for filing a petition for certiorari to the United States Supreme Court. *Lowe v. Fla. Dep't of Corrs.*, 679 F. App'x 756, 757-58 (11th Cir. 2017). His conviction would have become final 90 days after August 16, 2017: **November 14, 2017**.

Applying that date as the trigger for the one-year AEDPA period, McCormack would have accrued **352 days** of AEDPA time until **November 1, 2018**, when he filed his Motion for Postconviction Relief. ECF No. [16-1] at 104. Following denial, the appellate court's affirmance, and denial of rehearing, the mandate was issued on **September 25, 2020**, at which point the AEDPA clock would have begun ticking once again. *See id.* at 207 (denial); *id.* at 294 (affirmance); ECF No. [16-2] at 14 (denying rehearing); *id.* at 16 (mandate). From that date until **October 8, 2020**, the date when the instant Petition was deemed to have been filed, *see* ECF No. [19] at 1 n.1,

an additional **13 days** passed.

Thus, if McCormack is correct regarding when his convictions became final, he would have accrued a total of **352 + 13 = 365** untolled days prior to filing his Petition. His Petition would therefore be considered timely.

While the Court has again rejected McCormack's timeliness position, the Court recognizes that "jurists of reason" could "find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, McCormack is entitled to a certificate of appealability on the issue of timeliness.

Moreover, in light of the uncertainty regarding timeliness, the Court will proceed with a merits analysis of the claims within McCormack's Petition. *See Trussell v. Bowersox*, 447 F.3d 588, 590 (8th Cir. 2006) (considering the merits of a habeas petition despite its probable untimeliness (citing *Day v. McDonough*, 547 U.S. 198 (2006), for the proposition that the AEDPA statute of limitations is not a jurisdictional bar)); *see also Damian v. Vaughn*, 186 Fed. App'x 775, at *1 n.1 (9th Cir. 2006) (considering the merits of an untimely habeas petition).

### B.  The Merits of McCormack's Petition

In McCormack's Petition, he attacks his convictions and sentences for battery, kidnapping with a firearm, and aggravated assault with a firearm, following a jury trial in the Seventeenth Judicial Circuit in Broward County, Florida, case number 12-16738-CF-10A. ECF No. [13] at 7. In total, McCormack was sentenced to 30 years in prison. *Id.* In the instant Petition, he raises three claims of trial court error and six claims of ineffective assistance of counsel. *See id.* at 11-29.

#### 1.  The Evidence at Trial

***The State's Case***

The Government's evidence in this case largely consisted of the testimony of the victim, Samantha Baxter, and her eighteen-year-old daughter, Tiffany.

According to Samantha, she and McCormack got married in 2008. ECF No. [17-1] at 312. According to Samantha, their "marriage had been on the rocks" from the start. *Id*. The couple argued frequently, *id.*; McCormack was jealous and distrustful. *Id*. at 312, 406. He often accused Samantha of infidelity and maintaining a relationship with George, her ex-boyfriend. *Id.* at 328.

On November 1, 2012, Samantha fell asleep in Tiffany's room while watching a movie. *Id*. at 321. McCormack called her around midnight to ask where she was. *Id*. at 322. Samantha woke and went to a guest room to sleep. *Id.* at 324. She did not go to the room she and McCormack formerly shared, because they had ceased sleeping together in that room due to disagreements. *Id.* at 325.

Shortly after Samantha lay down on the bed in the guest room, McCormack entered and accused her of sleeping with George. *Id.* at 328. McCormack then pulled out a gun and told her he was going to shoot her in the head. *Id.* at 332. He inserted a magazine and loaded a bullet. *Id.* at 334-35. At this point, Samantha "spring[ed] off the bed" and enveloped McCormack in a "bear hug." *Id*. at 341-42. As the pair struggled, the gun discharged, but no one was hit. *Id*. at 344.

Having regained control, McCormack pointed the gun at Samantha's head and pulled her outside and into his car. *Id.* at 344. They drove to the house of McCormack's friend, but they did not enter. *Id*. at 355. McCormack then insisted Samantha take him to George's house. *Id.* at 358. While the car was stopped, Samantha saw an opportunity to disarm McCormack, who was driving while holding the gun. *Id.* at 366. She grabbed his testicles, causing him to bend down and bite her hand. *Id.* at 367. McCormack then apologized for biting Samantha and the two began driving back to their home. *Id.* at 370.

At some point on the way home, McCormack nearly hit another car, causing a police officer to follow them. *Id.* at 371. When they arrived home, the officer parked in front of the driveway while McCormack exited his car. *Id.* at 373. The officer asked where McCormack and Samantha

were coming from and whether they saw the car that McCormack nearly hit. *Id.* McCormack apologized and the officer departed. *Id*. at 374.

Upon returning home, the couple entered the guest room where the scuffle had occurred. *Id*. at 381. The bullet had damaged the tile floor and a closet mirror. *Id*. at 381. Samantha began cleaning the glass and bullet fragments. *Id.* at 384-85. She told McCormack to throw the gun in a nearby lake. *Id.* at 388. After he left to do so, Samantha woke Tiffany, who was asleep in her bed, and told her they had to go. *Id.* at 391. They went to the neighbor's house, explained what happened, and eventually called the police. *Id.* at 401.

Tiffany's testimony was generally consistent with Samantha's testimony. She stated that McCormack was a jealous man who ruined her relationship with George, whom she considered to be her father, because George recognized that his presence caused McCormack to create trouble. *Id*. at 499-500.

On the night in question, Tiffany explained that she did not hear the fight in the guest room or the shot fired because she is a hard sleeper. *Id*. at 486 ("My mom always yells at me for sleeping so hard."). In the morning, her mother had to physically shake her to wake her up. *Id.* at 498. After entering the neighbor's house, Samantha recounted to Tiffany what happened during the night, and Tiffany insisted that they call the police. *Id*. at 495-96. Samantha initially refused, but eventually consented to Tiffany calling the police. *Id.* at 497.

The State called Officer Gallardo, who testified as to his discussions with Tiffany, Samantha, and McCormack following Tiffany's call to the police. *Id*. at 515-534. He confirmed that Samantha had a fresh bite mark on her hand and appeared to be in shock. *Id*. at 521-23.

Lastly, the State called a crime scene technician, who testified that she conducted presumptive "gunshot residue testing" on Samantha's hand. *Id*. at 561-62. The result of the test was negative, indicating that Samantha did not fire the gun. *Id.* at 562. She did not conduct a test

on McCormack, because he was not present. *Id.* at 572.

### *McCormack's Defense*

McCormack's defense consisted entirely of his own testimony. He admitted to being a jealous person generally but denied being jealous of George specifically. *Id*. at 720-21. He claimed to have an excellent relationship with Tiffany and explained how he supported her financially. *Id.* at 619-21.

McCormack explained that, in the months leading up to the incident, he began to suspect Samantha of getting money from a drug-dealing ex-boyfriend. *Id*. at 625-26. This suspicion was based on new furniture and other expensive items she was purchasing that he did not think she could afford. *Id*. at 623-24.

On the night in question, McCormack testified that when he entered the guest bedroom, he found Samantha sitting in bed and counting money within a blue duffel bag. *Id*. at 632. He asked where the money came from. *Id.* at 633. As he tried to approach, Samantha suddenly pulled a firearm from the bottom of the bag and pointed it at McCormack's forehead. *Id*. at 634.

Using his training as a police detective in Jamaica, McCormack did an evasive maneuver and then pulled Samantha close to him to make it difficult for her to shoot him. *Id*. at 637. He bit her hand to loosen her grip on the gun. *Id*. at 638. During the scuffle, the gun discharged. *Id*. McCormack eventually succeeded in disarming Samantha and retrieving the gun. *Id.*

McCormack then threw the gun in a lake nearby their house. *Id.* at 644. McCormack began to drive toward his friend's house, but Samantha insisted on going with him. *Id*. at 646-47. When they arrived at the friend's house, the friend came out and spoke with them, advising them to call the police and terminate their relationship. *Id*. at 648.

On the way home, McCormack swerved while driving, causing a police officer to pull him over in front of his house. *Id*. at 648-49. The officer approached and asked if McCormack had been

drinking. *Id.* at 649. McCormack answered that he did not drink and had merely lost focus for a minute while driving. *Id*. The officer was satisfied and departed. *Id*. at 650.

At home, McCormack went upstairs. *Id*. at 651. From the window, he saw Samantha leave the house and walk to the neighbor's house with the blue duffel bag full of money. *Id*. at 653. She returned approximately one hour later. *Id*.

### 2.  Legal Standard

### *Deference Under § 2254*

A court's review of a state prisoner's federal habeas corpus petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Abdul–Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 642 (11th Cir. 2016) (quotation marks omitted). This standard is "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks omitted).

According to AEDPA, a federal court may not grant a habeas petitioner relief on any claim adjudicated on the merits in state court unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1053 (11th Cir. 2017) (citing 28 U.S.C. § 2254(d)).

A state court decision is "contrary to" established Supreme Court precedent when it (1) applies a rule that contradicts the governing law set forth by the Supreme Court; or (2) confronts a set of facts materially indistinguishable from a decision of the Supreme Court and

nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law is different from an incorrect application of federal law. *Id.* at 410. Consequently, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted). If the last state court to decide a prisoner's federal claim provides an explanation for its merits-based decision in a reasoned opinion, "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Even summary rejection of a claim, without explanation, qualifies as an adjudication on the merits, warranting deference. *See Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1351 (11th Cir. 2019). If the state court's merits determination is unaccompanied by an explanation, federal courts should "'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. Furthermore, a decision is still an adjudication on the merits when it "addresses some but not all of a defendant's claims." *Johnson v. Williams*, 568 U.S. 289, 298 (2013).

In sum, AEDPA "imposes a highly deferential standard for evaluating state-court rulings . . . and demands that state-court decisions be given the benefit of the doubt[.]" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quotation marks and footnote omitted). Deferential review under § 2254(d) is generally limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution guarantees criminal defendants

the right to assistance of counsel during criminal proceedings. *See Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). When assessing counsel's performance under *Strickland*, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance[.]" *Burt v. Titlow*, 571 U.S. 12, 20 (2013). "Where the highly deferential standards mandated by *Strickland* and AEDPA both apply, they combine to produce a doubly deferential form of review that asks only 'whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *Gissendaner v. Seaboldt*, 735 F.3d 1311, 1323 (11th Cir. 2013) (quoting *Harrington v. Richter*, 562 U.S. 86, 105 (2011)).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate both (1) that counsel's performance was deficient; and (2) a reasonable probability that the deficient performance prejudiced the defense. *See Strickland*, 466 U.S. at 687-88; *see also Harrington*, 562 U.S. at 104.

To establish deficient performance, the petitioner must show that, considering all circumstances, "counsel's conduct fell 'outside the wide range of professionally competent assistance.'" *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1356 (11th Cir. 2009) (quoting *Strickland*, 466 U.S. at 690). Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *See Strickland*, 466 U.S. at 690-91. The court's review of counsel's performance should focus on "not what is possible or 'what is prudent or appropriate, but only [on] what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (footnote omitted; quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). Counsel is not ineffective for failing to raise non-meritorious issues, *see Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); nor is counsel required to present every

non-frivolous argument, *see Dell v. United States*, 710 F.3d 1267, 1282 (11th Cir. 2013).

Regarding the prejudice component, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A court need not address both prongs of *Strickland* if the defendant makes an insufficient showing on one of the prongs. *See id.* at 697; *Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013).

### 3.   Analysis of McCormack's Claims

As noted above, McCormack raises three claims of trial court error and six claims of ineffective assistance of counsel.

### <u>Ground One</u>

In Ground One, McCormack argues that the trial court erred in denying his motion for mistrial due to the Prosecutor's allegedly impermissible comment on McCormack's right to remain silent. ECF No. [13] at 11. The State agrees that this claim was exhausted when McCormack raised it on direct appeal. ECF No. [15] at 7.

"A defendant in custody after receiving *Miranda* warnings indisputably has the right under the Fifth Amendment to remain silent." *United States v. Wilchcombe*, 838 F.3d 1179, 1190 (11th Cir. 2016). Accordingly, the Fifth Amendment prohibits "comment by the prosecution on the accused's silence[.]" *Griffin v. California*, 380 U.S. 609, 615 (1965). To determine whether the prosecution made an impermissible comment on a defendant's right to remain silent, the Eleventh Circuit directs courts to consider "whether the remark is 'manifestly intended' by the prosecutor or 'would naturally and necessarily be understood by the jury' as a comment on the defendant's silence." *Matire v. Wainwright*, 811 F.2d 1430, 1435 (11th Cir. 1987) (quoting *United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983)). "The comment must be examined in context, in order to

evaluate the prosecutor's motive and to discern the impact of the statement." *United States v. Knowles*, 66 F.3d 1146, 1163 (11th Cir. 1995).

"Because a trial judge is in the best position to evaluate both the tone and demeanor of the prosecutor, and the prejudicial effect of a statement or evidence on the jury, it is within that judge's discretion to grant or deny a mistrial. *United States v. Hernandez*, 490 F. App'x 250, 253 (11th Cir. 2012) (internal citations omitted). Accordingly, the mistrial determination must be made "in the context of the entire trial and in light of any curative instruction." *United States v. Newsome*, 475 F.3d 1221, 1227 (11th Cir. 2007). "When a district court gives a curative instruction, the reviewing court will reverse only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." *Id.* (quotation marks omitted).

McCormack takes issue with the Prosecutor's comment during cross examination of McCormack. ECF No. [13] at 11. The Prosecutor sought to impeach McCormack with statements he had made at a bond hearing twenty days after the incident occurred. ECF No. [17-1] at 661. Referring to that bond hearing, the Prosecutor asked:

> Q: That was the first time you gave a statement to anybody about anything in this case, correct?
>
> A: Correct.
>
> Q: 20 days after this happened.

*Id*. At this point, McCormack's counsel objected that the Prosecutor had improperly commented on McCormack's right to remain silent and moved for a mistrial *Id.* at 661-62. After the Court excused the jury, the Prosecutor explained that he was not commenting on McCormack's decision to remain silent during the 20 days following the incident, but rather was attempting to point out that when McCormack "made his statement . . . he had all of the information that the police had." *Id*. at 664. McCormack was therefore "able to tailor a story" based on that information. *Id*.

The judge deferred ruling on the motion for mistrial and immediately gave the following curative instruction:

> Ladies and gentlemen of the jury, let me remind you of an instruction that I've already given you previously, that in every criminal proceeding a defendant has the absolute right to remain silent. At no time is it the duty of a defendant to prove his innocence. From the exercise of a defendant's right to remain silent, a jury is not permitted to draw any inference of guilt.

*Id.* at 669. The trial court subsequently denied the motion for mistrial. *Id.* at 821.

 The full context of the cross examination reveals that the "20 days after" statement by the Prosecutor was not an impermissible comment on McCormack's right to silence. At the start of the cross examination, the Prosecutor pointed out that McCormack was the only testifying witness in the case who had the benefit of listening to other witnesses' testimony. ECF No. [17-1] at 659. "That makes [McCormack] the only person in the world that would be able to tailor [his] testimony to fit" prior testimony. *Id.* at 660. Later, after the Court issued the curative instruction set forth above, the Prosecutor resumed his line of questioning, emphasizing that, when McCormack testified at the bond hearing, he "knew all the information that the police had in this investigation," including what Samantha had said. *Id.* at 669-70.

The Prosecutor's questions – both before and after the alleged impermissible statement – support the Prosecutor's explanation as to why he commented on the fact that McCormack did not provide a statement in this case until 20 days after the incident occurred. ECF No. [17-1] at 664. The Prosecutor was attempting to show that, at the time of McCormack's statement, McCormack had sufficient information from the State to "tailor a story" to fit that evidence. *Id.* The purpose of the Prosecutor's comment was to cast doubt on McCormack's testimony at the bond hearing and at trial. It was not "manifestly intended" to be a comment on McCormack's silence, nor would it be "naturally and necessarily be understood by the jury" as such. *Matire*, 811 F.2d at 1435 (quotation marks omitted).

Moreover, to the extent that the Prosecutors' comment created any doubt or confusion regarding McCormack's right to silence, the trial court immediately issued an accurate curative instruction. The minor remark in this case was certainly not "so highly prejudicial as to be incurable by the trial court's admonition." *Newsome*, 475 F.3d at 1227 (quotation marks omitted); *see also Al-Amin v. Warden Ga. Dep't of Corrs.*, 932 F.3d 1291, 1300 (11th Cir. 2019) (finding no prejudice despite "substantial" constitutional error and a curative instruction that was "largely ineffective").

Accordingly, Ground One is denied on the merits.

**Grounds Two and Three**

In Ground Two, McCormack claims that the trial court abused its discretion and violated double jeopardy by imposing consecutive sentences for McCormack's convictions of aggravated assault and kidnapping. ECF No. [13] at 13. In the related Ground Three, McCormack argues the convictions themselves are "barred by double jeopardy protections under the Fifth Amendment[.]" *Id*. at 15. The State agrees that both of those related claims were raised in some form on direct appeal.[1] ECF No. [15] at 7-8.

The Double Jeopardy Clause "protects against multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quotation marks omitted). When a defendant's single act violates two separate statutes, consecutive sentences are permissible "if each statute requires proof of an additional fact which the other does not[.]" *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Under Florida law, "kidnapping and aggravated assault are separate offenses, each requiring proof of an element that the other does not." *Wilkins v. State*, 543 So. 2d 800, 801

---

[1] In light of the Court's conclusion that those claims are clearly without merit, the Court declines to address the State's additional argument that Ground Two is also procedurally defaulted. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) (recognizing a district court's authority to pass over a procedural-bar issue and deny a habeas claim on the merits when doing so is in the interest of judicial economy).

(Fla. 5th DCA 1989). Accordingly, even if McCormack's kidnapping and aggravated assault convictions were the result of the same act, the Double Jeopardy Clause would permit consecutive sentences. *See Harris v. Sec'y, Dep't of Corrs.*, No. 18-cv-1075, 2020 WL 5876943, at *5 (M.D. Fla. Oct. 2, 2020) (finding no Double Jeopardy violation for sentences for kidnapping and aggravated assault).

In actuality, however, the trial court determined that McCormack's convictions stem from *separate acts*. ECF No. [17-3] at 11. The trial court reasoned that the aggravated assault occurred in the bedroom when McCormack threatened to kill Samantha and the gun was discharged, and the kidnapping occurred after, when McCormack forced her into the car. *Id.* That determination was a reasonable interpretation of the evidence presented in this case and it is entitled to deference by this Court. *See Wilson*, 138 S. Ct. at 1192.

Finally, although the trial court initially believed that it was required to give McCormack consecutive sentences, *see* ECF No. [17-3] at 3, the trial court subsequently held a resentencing hearing. There, the sentencing judge definitively stated that he was excising his discretion to impose consecutive terms. *Id.* at 11. McCormack has not shown that federal law prohibited the trial court from ordering those consecutive sentences.

Accordingly, Grounds Two and Three are denied.

## **Ground Four**

In his fourth claim, McCormack asserts that his trial counsel was ineffective for "failing to strike an admittedly biased juror." ECF No. [13] at 17. The State agrees this issue was exhausted in state court because it was raised within McCormack's motion for post-conviction relief and appeal to the Fourth DCA. ECF No. [15] at 8-9.

During jury selection, McCormack's counsel asked whether jurors would give a police officer's testimony "a little more weight than a regular person." ECF No. [17-1] at 202. Venire

member Humphreys stated that her father was in the military, she was taught that certain people "choose to protect and serve," and she tends to "put more weight behind what they are saying[.]" *Id*. McCormack's counsel reiterated his question as to whether Humphreys would give an officer's testimony "more weight than an average lay witness," to which Humphreys answered, "Right." *Id*.

McCormack's counsel then asked if Humphreys could follow the judge's instruction "that every individual's testimony should carry the same weight" if the jurors believe them. *Id*. at 203. Humphreys answered, "I think I could be impartial if I needed to be." *Id*. McCormack's counsel did not move to strike her for cause, and she was selected to be on the jury. *Id*. at 240.

Petitioner argues that Humphreys' statements evinced her "actual bias" in favor of law enforcement, and that such bias was incapable of being rehabilitated. ECF No. [13] at 17. Counsel was therefore ineffective for failing to strike her. *Id*.

Effective assistance of counsel is required during jury selection. *Brown v. Jones*, 255 F.3d 1273, 1278-79 (11th Cir. 20021). "Because empaneled jurors are presumed impartial, [McCormack] must show that the juror selection process produced a juror that was actually biased against him to satisfy *Strickland's* prejudice prong." *Rockett v. Sec'y, Dep't of Corrs.*, 2014 WL 3809146, at *15 (M.D. Fla. Aug. 1, 2014). There is a "strong presumption" that trial counsel's jury selection decisions "were the result of sound trial strategy." *Brown v. Jones*, 255 F.3d 1273, 1279 (11th Cir. 2001).

McCormack has not shown that Humphreys was actually biased against him. Though Humphreys initially expressed an inclination to favor a law officer's testimony, she averred that she was capable of following the judge's instructions regarding impartiality. ECF No. [17-1] at 203. "Jurors are presumed to follow the trial court's instructions." *Miller v. United States*, 562 F. App'x 838, 845 (11th Cir. 2014). McCormack has not met his burden to show that Humphreys was unwilling or unable to do so, nor has he shown that his counsel's decision to accept her as a

juror was anything other than "sound trial strategy." *Brown*, 255 F.3d at 1279.

Moreover, the testimony of law enforcement officers played a relatively small role in this case. Virtually all relevant evidence came from the testimony of Samantha, Tiffany, and McCormack – who happened to have been a law enforcement officer in Jamaica, prior to moving to the United States. ECF No. [17-1] at 343. Thus, even if McCormack had shown that Humphreys was biased in favor of police officers – which he has not – his ineffective assistance claim "would still fail because he cannot establish that failing to strike [her] prejudiced the outcome of his trial." *Miller*, 562 F. App'x at 845.

Ground four is denied.

## **Ground Five**

In his fifth claim, McCormack asserts that his trial counsel was ineffective for failing to investigate exculpatory evidence and call favorable witnesses. ECF No. [13] at 19. The State agrees this issue was preserved within McCormack's motion for post-conviction relief and subsequent appeal to the Fourth DCA. ECF No. [15] at 9.

McCormack asserts that his counsel should have called three witnesses: the friend whose house McCormack and Samantha visited during the kidnapping; the police officer who spoke with McCormack and Samantha that night; and the neighbor Samantha and Tiffany visited in the morning after the incident. ECF No. [13] at 20. McCormack characterizes those individuals as "material exculpatory witnesses," but he does not explain what testimony they would have given. *Id*. at 19.

"[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir.

1978);[2] *see also Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (recognizing that vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim and do not warrant an evidentiary hearing). "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995). Therefore, "[w]here a claim of ineffective assistance is based on counsel's failure to call a witness, the burden to show prejudice is heavy because often allegations of what a witness would have testified to are largely speculative." *Walker v. Sec'y, Fla. Dep't of Corrs.*, 495 F. App'x 13, 17 (11th Cir. 2012).

As noted above, McCormack has not specified what material testimony the friend, the police officer, or the neighbor would have given. There is no indication that any of those three individuals had relevant information as to the key facts of this case regarding what occurred in the guest bedroom, who threatened whom with a gun, and whether Samantha went willingly into McCormack's car. McCormack's unsupported assertion that those individuals would have supported his version of the events is merely a "conclusory allegation[ ] unsupported by specifics" that does not amount to a valid claim of ineffective assistance of counsel. *Tejada*, 941 F.2d at 1559 (quotation marks omitted).

Ground Five is denied.

**<u>Ground Six</u>**

In his sixth claim, McCormack alleges trial counsel ineffectiveness for failing to retain and call a gunshot residue expert. ECF No. [13] at 21. The State agrees this issue was exhausted in state court because it was raised within McCormack's motion for post-conviction relief and appeal

---

[2] The Eleventh Circuit has adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

to the Fourth DCA. ECF No. [15] at 9.

As noted above, the State called a crime scene technician who testified that she conducted "gunshot residue testing" on Samantha's hand. ECF No. [17-1] at 561-62. She testified that the presumptive test was negative, indicating that Samantha did not fire the gun. *Id.* at 562. She did not conduct a test on McCormack because he was not present. *Id.* at 572. On cross examination, McCormack's counsel elicited the facts that the test conducted was merely a "presumptive" field test; a more accurate lab test was not conducted. *Id*. at 575.

McCormack asserts that a gunshot residue expert called by defense would have "rebutted the conclusions reached by the State's expert." ECF No. [13] at 21. His counsel's failure to call such an expert "left the jury with no other option but to accept the State's expert's conclusion that [Samantha] had not fired the gun, and by extension, drew an inference that [McCormack] was in fact the one who caused the gun to fire." *Id*.

As noted in the Court's discussion of Ground Five, McCormack has a "heavy" burden to show prejudice stemming from his counsel's decision not to call a witness "because often allegations of what a witness would have testified to are largely speculative." *Walker*, 495 F. App'x 17. McCormack has not specified what aspect of the State's witness's testimony would have been rebutted by defense's gunshot residue expert. Instead of calling such an expert, McCormack's counsel opted for the strategy of emphasizing that the field test conducted by the State's witness is less reliable than a lab test. ECF No. [17-1] at 575. McCormack has not rebutted the presumption that his counsel's strategy was reasonable; his "conclusory allegation[ ] unsupported by specifics" is insufficient to show deficient performance or prejudice. *Tejada*, 941 F.2d at 1559 (quotation marks omitted).

Accordingly, Ground Six is denied.

**Ground Seven**

In his seventh claim, McCormack alleges trial counsel ineffectiveness for failing to clarify McCormack's testimony during cross-examination regarding a prior inconsistent statement he made about the firearm used in this case. ECF No. [13] at 23. The State agrees this issue was exhausted in state court because it was raised within McCormack's motion for post-conviction relief and appeal to the Fourth DCA. ECF No. [15] at 9-10.

Throughout McCormack's testimony at trial, he asserted that the gun he claims Samantha pointed at him was a semiautomatic pistol, as opposed to a revolver. ECF No. [17-1] at 635, 657. On cross examination, the State impeached McCormack with his testimony from a pretrial hearing, in which he stated that the weapon was a revolver. *Id*. at 679. McCormack claims that his trial counsel failed to rehabilitate him on rebuttal. ECF No. [13] at 23. He argues that his counsel should have elicited that, after McCormack stated it was a revolver at the pretrial hearing, he "immediately corrected himself[.]" *Id*.

The trial transcript reveals that counsel's performance was not deficient. As an initial matter, during direct examination of McCormack, his counsel tried to address the semiautomatic/revolver inconsistency. ECF No. [17-1] at 657-58. He asked McCormack if he ever "use[s] those two words interchangeably[.]" *Id.* Although McCormack's answer was not helpful, *Id.* at 658 ("I'm not sure if I'm following you."), counsel's questioning reveals that he attempted to get ahead of an impeachment issue he reasonably and accurately anticipated. Later, in closing argument, McCormack's counsel defended McCormack's credibility, arguing that "the worst" the State proved was that McCormack "said revolver instead of automatic." *Id*. at 782. This was a reasonable strategy to downplay the importance of McCormack's inconsistent statements.

Moreover, as the State points out, McCormack did not "immediately" correct his testimony at the pretrial hearing regarding his description of the gun as a revolver. ECF No. [17-4] at 9. In

that hearing, he stated the firearm was a revolver during direct examination, and then stated that it was a pistol during cross examination. *Id*. at 16-17. It is speculative whether pointing out McCormack's supposed correction on cross examination would have been the better strategy.

In sum, the Court concludes that McCormack's counsel made tactical decisions as to how to address the State's impeachment of McCormack. Those decisions were reasonable and well within "the wide latitude counsel must have in making tactical decisions." *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (quotation marks omitted). As such, McCormack has failed to show that his counsel's performance was deficient under *Strickland*. Ground Seven is denied.

### **Ground Eight**

In his eighth claim, McCormack asserts that his trial counsel was ineffective for failing to object to a *Giglio* violation. ECF No. [13] at 125. The State agrees this issue was exhausted in state court because it was raised within McCormack's motion for post-conviction relief and appeal to the Fourth DCA. ECF No. [15] at 10.

According to McCormack, the *Giglio* violation occurred during the testimony of the Crime Scene Technician ("CST"), who testified that the result of the gunshot residue test on Samantha's hands was negative. ECF No. [13] at 25. McCormack asserts that the CST's testimony was false, as evidenced by a deposition of Samantha in which she stated that the CST had told her the result of the gunshot residue test was positive. *Id*.

*Giglio* prohibits the Government from knowingly presenting perjured testimony. *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quotation marks omitted) (citing *Giglio v. United States*, 405 U.S. 150 (1972)). "To obtain a reversal on the grounds that the government relied on perjured testimony, the following must be shown: (1) the contested statements were actually false, (2) the statements were material, and (3) the prosecution knew that they were false." *United States v. Bailey*, 123 F.3d 1381, 1398 (11th Cir. 1997) (quotation marks omitted).

Here, it is true that Samantha stated in a deposition that the CST told her that the result of the gunshot residue test was positive. ECF No. [17-6] at 5. She stated that the CST told her that her hands "tested positive for residue, but . . . not enough to say [Samantha] was the one with the gun[.]" *Id.*

However, the CST's testimony at trial was entirely consistent with the CST's deposition, wherein she testified that the result of the gunshot residue test was negative. ECF No. [17-5] at 18. McCormack's counsel indisputably had the deposition testimony of both Samantha and the CST. Moreover, during trial, the Government averred that it had produced during discovery a photograph of the negative presumptive test result. ECF No. [17-1] at 564. The trial court found that no discovery violations had occurred and McCormack "was on notice of the presumptive gunshot residue test as early as September of 2013." *Id.* at 567.

This record does not reveal that the CST committed perjury. Although the CST's testimony differed from Samantha's deposition testimony, such contradictory testimony "does not amount to a showing that the government knowingly presented false testimony." *United States v. Michael*, 17 F.3d 1383, 1385 (11th Cir. 1994). The Eleventh Circuit instructs not to "impute knowledge of falsity to the prosecutor where a key government witness' testimony is in conflict with another's statement or testimony." *Id.* Accordingly, McCormack's *Giglio* claim fails because he has not demonstrated that the CST's testimony was false.

Because the underlying *Giglio* claim is without merit, McCormack's counsel did not perform deficiently in failing to raise it. *See Denson v. United States*, 804 F.3d 1339, 1342 (11th Cir. 2015) ("Failing to make a meritless objection does not constitute deficient performance."). Ground Eight is denied.

### **Ground Nine**

In his final claim, McCormack asserts that he was denied ineffective assistance of counsel

for failing to object "to multiple incidents of prosecutorial misconduct during closing arguments." ECF No. [13] at 27. The State agrees this issue was exhausted in state court because it was raised within McCormack's motion for post-conviction relief and appeal to the Fourth DCA. ECF No. [15] at 10.

McCormack asserts that the Prosecutor made four types of impermissible comments during closing. ECF No. [13] at 27. First, McCormack argues that the Prosecutor impermissibly bolstered the State's witnesses with the following comments: "a reasonable person with common sense" would conclude that Tiffany and Samantha were telling the truth; "listen to these women shaking, crying who obviously did not concoct a story"; "take what they said as truth"; "[Samantha] is not lying. If [Samantha and Tiffany] are lying, they are the worst liars I've ever seen." *Id*. Second, McCormack argues that the Prosecutor impermissibly inserted his personal opinion by stating, "Mr. McCormack is guilty. That's it." *Id.* Third, McCormack argues that the Prosecutor denigrated the defense's version of the events as "ridiculous," "concocted," and created "out of thin air." *Id*. Lastly, McCormack argues that the Prosecutor misrepresented the evidence by stating that Samantha called the police, when in fact Tiffany made the call. *Id*.

Under Florida law, "[w]ide latitude is permitted in arguing to a jury." *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982). Prosecutors' closing arguments are not limited to "flat, robotic recitations of 'just the facts." *Diaz v. State*, 797 So. 2d 1286, 1287 (Fla. 4th DCA 2001). Rather, it "is a time for robust, vigorous, challenging . . . of an opponent's ideas." *Id.* (quotation marks omitted).

Having reviewed the specific comments quoted by McCormack and the Prosecutor's closing argument in full, the Court does not find that the Prosecutor's comments clearly exceeded the bounds permitted by Florida law. Particularly under the "doubly differential" standard of review created by *Strickland* and AEDPA, the Court does not find deficient performance by

McCormack's counsel in declining to object to the statements. *Gissendaner*, 735 F.3d at 1323. Moreover, McCormack is unable to show prejudice since the jury was properly instructed by the trial court that attorneys' argument is not evidence. ECF No. [17-1] at 751; *see Miller*, 562 F. App'x at 845 ("Jurors are presumed to follow the trial court's instructions."). Ground Nine is denied under both prongs of *Strickland*.

### 4.  Evidentiary Hearing

In a habeas corpus proceeding, the burden rests on the petitioner to establish the need for an evidentiary hearing. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011). "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007); *see also Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016). Here, the issues presented have been resolved based on the record before the Court. Because the Court can "adequately assess [McCormack's] claim[s] without further factual development[,]" McCormack is not entitled to an evidentiary hearing. *Turner v. Crosby*, 339 F.3d 1247, 1275 (11th Cir. 2003).

### 5.  Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his or her petition for writ of habeas corpus has no absolute entitlement to appeal; rather, in order to do so, he must obtain a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a certificate of appealability only if McCormack makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where the district court rejects a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists "would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Where the district

court rejects a petitioner's claims on procedural grounds, the petitioner must additionally show that "jurists of reason" would find the district court's procedural ruling "debatable." *Id.*

For the reasons stated above, the Court grants a certificate of appealability as to the issue of whether McCormack's Petition was timely. The Court denies a certificate of appealability as to all Grounds raised within his Petition.

## IV.    CONCLUSION

For the foregoing reasons, the Court has reconsidered its prior ruling and again concluded that McCormack's Petition is untimely. In an abundance of caution, however, the Court has analyzed the merits of McCormack's claims and found them to be without merit. Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. McCormack's Motion to Reconsider, Alter, or Amend Judgment, **ECF No. [20]**, is **GRANTED**.

2. The Court's Order of Dismissal, **ECF No. [19]**, is **VACATED**.

3. McCormack's Petition, **ECF No. [13]** at 7-31, is **DENIED**.

4. A certificate of appealability is **GRANTED** as to the issue of timeliness only.

5. To the extent not otherwise disposed of, any pending motions are **DENIED AS MOOT** and all deadlines are **TERMINATED**.

6. The Clerk of Court is directed to **CLOSE** this case.

**DONE AND ORDERED** in Chambers at Miami, Florida, on October 26, 2022.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Case No. 21-cv-60555-BLOOM

Copies to:

Counsel of Record

Orland McCormack, *Pro Se*
#147407
Madison Correctional Institution
Inmate Mail/Parcels
382 SW MCI Way
Madison, FL 32340

Noticing 2254 SAG Broward and North
Email: CrimAppWPB@MyFloridaLegal.com